IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

JOHNNY A. RUCKER, JR.                                          PETITIONER
ADC #102096

V.                                  NO. 5:07cv00051 JWC

LARRY NORRIS, Director,                                        RESPONDENT
Arkansas Department of Correction


## MEMORANDUM OPINION AND ORDER

Johnny A. Rucker, Jr., an Arkansas Department of Correction inmate, brings this

petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (docket entry #3).

Respondent concedes that Petitioner is in his custody and has exhausted all nonfutile state

remedies, *see* 28 U.S.C. § 2254(a-c), but asserts that the petition should be denied for

other reasons (docket entry #8).  Petitioner has replied (docket entries #16, #17, #20, #21).

For the reasons that follow, the petition must be **denied**.[1]


I.
Background

The body of Cindi Smith was found by her father in her mobile home in Arkadelphia,

Arkansas, about 10:00 a.m. on February 10, 1993.  The body was on its side on the floor

with a .22 caliber pistol resting on the left hand.  The victim had been shot in the back of

the head.  Her car was missing, and the police had been receiving reports that morning

that someone was attempting to cash checks on the victim's bank account at various local

businesses.  Petitioner, a crack cocaine user, was living with the victim at the time of her

---

[1]The parties have consented to the jurisdiction of the Magistrate Judge (docket entry #7).

death.  Based on this information, the police put out an alert, which described the vehicle and gave its license plate number, stated that Johnny Rucker (Petitioner) was probably the driver and had been passing forged checks in Arkadelphia, and stated that the owner of the vehicle had been found dead.  The police in nearby Gurdon later stopped Petitioner, who was driving the victim's car.  Inside the car, police found .22 shells, and the victim's purse and blank checks.  Petitioner was taken to Arkadelphia where he gave a statement implicating himself in the murder.

Following a six-day jury trial in September and October 1993 in the Clark County Circuit Court, Petitioner was convicted of capital murder for Smith's death, and he was sentenced to life imprisonment without parole.  (Resp't Ex. 1.)[2]  He appealed to the Arkansas Supreme Court, asserting that the trial court erred: (1) in denying his motion for directed verdict due to insufficient evidence; (2) in allowing the state to amend the information to add an alternative charge; (3) in not arraigning him or taking a plea from him on the alternative charge; (4) in denying his motion to suppress evidence obtained in the search of the victim's car as the fruit of an illegal arrest; (5) in denying his motion to suppress his statements as based on an illegal arrest; (6) in finding that he made a voluntary confession; (7) in excluding trial testimony from defense witnesses Russ Burbank and James Howard; (8) in failing to order a psychiatric evaluation by the state hospital; (9) in admitting testimony that the victim's father made regular deposits in her checking account; and (10) in admitting testimony that the victim deposited child support payments

---

[2]Unless otherwise indicated, Respondent's exhibits are attached to docket entry #8.

into her checking account.  (Resp't Ex. 2.)  Finding no error, the court affirmed Petitioner's conviction.  *Rucker v. State*, 899 S.W.2d 447 (Ark. 1995) (*Rucker I*).

Petitioner then brought, through present counsel, a petition for post-conviction relief pursuant to Ark. R. Crim. P. 37, asserting that: (1) his trial attorney was ineffective for failing to call witnesses Frank Smith, Gyrone Buckley and Steve Bratton; (2) his attorney was ineffective for failing to challenge his statement based on cocaine intoxication or delirium; (3) his attorney was ineffective for advising him not to testify; (4) his attorney failed to offer a proper jury instruction on determining the voluntariness of a confession and failed to pursue the issue on appeal; (5) his attorney was ineffective for failing to question moving of the gun or body; (6) his attorney was ineffective for failing to object to multiple theories of guilt but use of a general verdict; (7) he is actually innocent; (8) there was no arraignment on the amended information; (9) a delay in obtaining a defense investigator prejudiced the investigation; (10) cumulative error; and (11) the sixty-day limitations period for filing Rule 37 petitions violates due process. (Resp't Ex. 3.)  Following a hearing,[3] his petition was denied on the merits.  *Rucker v. State*, No. CR93-12 (Clark Co. Cir. Ct. May 29, 1996) (Resp't Ex. 4).  The Arkansas Supreme Court affirmed the denial on appeal. *Rucker v. State*, No. CR 96-1029, 1998 WL 26206 (Ark. Sup. Ct. Jan. 15, 1998) (Resp't Ex. 5) (*Rucker II*).

---

[3]In a post-hearing brief, Petitioner added a claim: that his bloodstained shirt should have been suppressed due to an unconstitutional search.  *See Rucker II*, *infra*.

3

Petitioner then filed, through present counsel, a federal habeas petition in this Court.[4] The Magistrate Judge recommended dismissal on the merits with prejudice (Resp't Ex. 6); however, after reviewing Petitioner's objections, the District Judge instead dismissed the petition without prejudice to allow Petitioner to exhaust state court remedies by seeking scientific testing under the newly enacted Act 1780 of 2001, codified as Ark. Code Ann. § 16-112-201 to -207 (2002).[5]  *Rucker v. Norris*, No. 5:99cv00025-GH (E.D. Ark. Oct. 31, 2001) (Resp't Ex. 7) (*Rucker III*).

Petitioner returned to state court, filing a state petition for writ of habeas corpus under Act 1780.  (Resp't Ex. 11.)  The Clark County Circuit Court initially denied the petition without a hearing, but the Arkansas Supreme Court reversed and remanded for a hearing.  *Rucker v. State*, No. CR 02-145, 2004 WL 1283985 (Ark. Sup. Ct. June 10, 2004) (Resp't Ex. 8, 9, 10) (*Rucker IV*).  The circuit court held an evidentiary hearing on January 24, 2005 (docket entry #12), and again denied relief.  The Arkansas Supreme Court affirmed.  *Rucker v. State*, No. CR 05-689, 2006 WL 650371 (Ark. Sup. Ct. Mar. 16, 2006) (Resp't Ex. 12, 13) (*Rucker V*).

Petitioner then filed this federal habeas petition through retained counsel, advancing the following claims:

---

[4]He advanced two claims: (1) he was denied due process of law and a fair trial by the trial court's failure to instruct the jury that it was to determine the weight to be given a confession; and (2) he was denied the effective assistance of counsel by his attorney's failure to request a jury instruction stating that the jury determines the weight given a confession, and his failure to pursue the issue on appeal.

[5]This is the statute in effect at the relevant time.  Parts of the statute were later rewritten by Act 2250 of 2005.  *See* Ark. Code Ann. §§ 16-112-201, 16-112-202, 16-112-208 (2006).

1.      His statement to police was not shown to be voluntary or true by a preponderance of the evidence, and the state courts and defense counsel's actions limited his ability to argue the voluntariness and validity of the statement to the jury;

2.      Petitioner has a due process right and right to present a defense by having the fingerprints on the murder weapon checked against the Automated Fingerprint Identification System (AFIS) or three named individuals; and

3.      Juror misconduct created a biased jury because three jurors withheld from the trial court and the parties that they had a relationship with the victim or the prosecutor, denying Petitioner a fair trial under the Sixth Amendment and due process of law under the Fourteenth Amendment.


II.
General Law

Respondent asserts that this Court should defer to the Arkansas Supreme Court's determinations regarding some of Petitioner's claims and that some of his claims are procedurally defaulted due to his failure to present them to the state courts.

A.      § 2254 Deference.

In the interests of finality and federalism, a federal habeas court is constrained by statute to exercise only a "limited and deferential review of underlying state court decisions."  *Greer v. Minnesota*, 493 F.3d 952, 956 (8th Cir.), *cert.denied*, 128 S. Ct. 672 (2007).  Where a state court has previously adjudicated a claim on the merits, a federal habeas court may grant habeas relief for the same claim in only three limited situations: where the state court adjudication (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); **or** (2) "involved an unreasonable application" of clearly established federal law, *id.*; **or** (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).  In evaluating a state court decision under §

5

2254(d), a federal habeas court must presume any factual findings made by the state court to be correct unless rebutted by clear and convincing evidence. *Id.* § 2254(e)(1).

A state court decision is "contrary to" federal law under § 2254(d)(1) if it applies a rule that contradicts the controlling Supreme Court authority or if it applies the controlling authority to a case involving facts "materially indistinguishable" from those in a Supreme Court case, but nonetheless reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court's decision involves an "unreasonable application" of federal law under § 2254(d)(1) if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The habeas court must "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

B.   <u>Procedural Default</u>.

Before seeking federal habeas review, a state prisoner must first fairly present the substance of each claim to each appropriate state court, thereby alerting those courts to the federal nature of his claims and giving them an opportunity to pass upon and correct any constitutional errors made there. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *see* 28 U.S.C. § 2254(b) & (c) (requiring federal habeas petitioner to pursue all remedies available in the state courts). A federal habeas petitioner's claims must rely on the "same factual and legal bases" relied on in state court. *Interiano v. Dormire*, 471 F.3d 854, 856 (8th Cir.

2006).  Claims in a federal habeas petition that were not presented in state court and for which there is no remaining state court remedy are procedurally defaulted.  *Id.*

Where a procedural default has occurred, federal habeas review is permitted only if the petitioner can demonstrate (1) cause for the default <u>and</u> actual prejudice as a result of the alleged violation of federal law, or (2) that failure to consider the claims will result in a fundamental miscarriage of justice, that is, that a constitutional violation has resulted in the conviction and continued incarceration of one who is actually innocent.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  If no cause has been shown, the prejudice element need not be addressed.  *McCleskey v. Zant*, 499 U.S. 467, 502 (1991).


III.
<u>Ground 1: Voluntariness of Statement</u>

In support of this claim, Petitioner raises three sub-claims (docket entries #3, at 17-27; #16, at 4-13).  First, he says he was not capable of voluntarily waiving his right to self-incrimination at the time of the statement because of his crack cocaine intoxication, mental condition and low IQ, and he was spoonfed incorrect information by the police which he apparently repeated while not in a proper state of mind to voluntarily do anything.  Next, he says the police refused to videotape the entire process from *Miranda*[6] warning to conclusion of the incriminating statement, which would have shown his physical and mental state, resulting in a due process violation and constituting spoliation of potential evidence.  Third, he says the voluntariness and credibility issues were unconstitutionally taken from

_____

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the jury by (1) the trial court's refusal to give an instruction that voluntariness is a question for the jury, (2) the trial and appellate courts' determinations that two witnesses were irrelevant or cumulative, and (3) defense counsel's failure to proffer a proper instruction on voluntariness.   Respondent argues that this Court must defer to the Arkansas Supreme Court's decision on the voluntariness of Petitioner's statement and that the remaining issues are procedurally defaulted or without merit.

      A.    <u>Voluntariness</u>.

      1.    <u>Applicable Law</u>.  It is clearly established federal constitutional law that statements coerced from a defendant may not be used against him at trial.  *Miller v. Fenton*, 474 U.S. 104, 109-10 (1985); *see Withrow v. Williams*, 507 U.S. 680, 688 (1993) (issue of voluntariness of confession implicates Fifth and Fourteenth Amendments).  In determining whether a confession was coerced, and therefore involuntary, a court must consider the totality of the circumstances.  *Withrow*, 507 U.S. at 688-89, 693.  These include, among other things: the degree of police coercion, including the use of any physical punishment; the length of detention; the length, location and continuity of the interrogation; whether the defendant was advised of his constitutional rights; and the defendant's maturity, education, physical condition, level of intelligence, and mental health.  *Id.* at 693-94; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).  A defendant's mental condition cannot render his confession involuntary unless it coincides with improper conduct by the police.  *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).  The ultimate test is whether the confession was "the product of an essentially free and unconstrained choice by its maker" or whether "his will has been overborne and his capacity for self-determination critically impaired."  *Schneckloth*, 412 U.S. at 225-26.

8

2.    State Court Proceedings.  Before trial, Petitioner filed a motion to suppress his custodial statements.  (R. 141-42, 218-19, 247-48.)[7]  Following an evidentiary hearing August 12-13, 1993, the trial court denied the motion.  (R. 494-765, 290-94.)

At the suppression hearing, the following evidence was presented.  Around 1:00 p.m. on February 10, 1993, the city marshall in Gurdon stopped Petitioner and held him at gunpoint until another Gurdon officer arrived.  The officers handcuffed Petitioner, read him his rights, told him he was under arrest for passing forged checks and placed him in the police car.  (R. 497-507.)  Criminal Investigator Mitch Pierce of the Clark County Sheriff's Office arrived shortly and again advised Petitioner of his rights, going over each right individually.  In response to Pierce's questions, Petitioner said he had been advised of his rights and understood them, was driving his girlfriend's vehicle, drove it regularly, did not know if she knew he had it, had seen her the night before, and had been cashing checks on her bank account and "doing drugs" with the money.  The statement was not written down or tape-recorded.  Pierce said Petitioner did not appear to be under the influence of any drugs at the time, he was steady on his feet, his speech was not slurred, and he appeared to have normal dilation and constriction of the pupils.  (R. 519-20, 524-26.)

Petitioner was arrested and transferred to the Arkadelphia Police Department, where he was questioned by Criminal Investigator J.R. Daniel beginning at 1:43 p.m. Robert Gibbs, an Arkansas State Police investigator, was also present.  Daniel testified that he told Petitioner the officers were investigating Cindi Smith's death and needed to talk

---

[7]All record references are to the record of Petitioner's pretrial and trial proceedings in the circuit court, as submitted in his direct appeal (*see* docket entries #18, #19).

to him about it, but first wanted to read his rights to him.  Daniel testified that he then put the rights form in front of Petitioner, said he (Daniel) would read the rights out loud one at a time, ask if Petitioner understood and, if the answer was yes, Petitioner was to write yes on the appropriate line and put his initials beside it.  Daniel said he told Petitioner that, if his answer was no, he was to tell Daniel, who would then try to explain.  Daniel testified that, as he read the rights to Petitioner, he appeared to be okay, understood what Daniel was saying and understood what to do.  Daniel said Petitioner was very cooperative, responded yes to each right, initialed each one, said he understood them, signed the rights form, and agreed to talk to the officers.  (R. 586-90.)

Daniel testified that he told Petitioner the officers thought he knew something about Cindi's death.  Petitioner said he did, and asked how she had been killed.  Daniel said she had been shot and her body had been sent to the crime lab to determine the type of gun.  Then, according to Daniel, Petitioner proceeded to give a statement and, as he talked, Daniel wrote it down on paper.  He said he did not supply Petitioner with any information about the murder, other than saying the victim had been shot.  (R. 588-91.)

According to Daniel, Petitioner first claimed the victim's death was an accident, although he admitted that he cashed some checks on her account.  Daniel said he told Petitioner that he thought he was lying about part of what happened and that Petitioner should go ahead and tell him the whole truth.  Daniel testified that Petitioner then changed his account, saying he shot Cindi in the back of the head with a .22 caliber pistol because he wanted to leave and do more crack cocaine and he knew she would try to stop him.  According to Daniel, Petitioner said he then left and started purchasing more crack cocaine and writing checks on her account.  He said he returned later, moved Cindi's body from the

10

couch to the floor, placed the .22 pistol in her hand, changed clothes and left again.  (R. 591-92.)

Daniel said he wrote the statement down, then had Petitioner read and sign it.  He said he then had Officer Gibbs videotape Daniel reading the statement aloud to Petitioner and asking Petitioner if he had signed it and if it was what he had said.   Petitioner answered on tape that it was his statement.   On the tape, Daniel also asked Petitioner if he had been promised or threatened in any way to give the statement, to which he answered no.  At the suppression hearing, the prosecutor asked to play the video to show Petitioner's demeanor at the time.  Over Petitioner's objection, the video was played for the judge.  Daniel testified that, during the interview, Petitioner never asked for an attorney or asked to stop answering questions.  Daniel said that Petitioner said he had been doing crack cocaine the night before and during the day before he was picked up.  (R. 592-94, 597.)

Although the tape was not provided here, the prosecutor described Petitioner's taped behavior, saying he was "not shaking in hyperactivity," his speech was "not slurred," and he "even stopped the questioning one time to ask and make certain he understood something and, at the end, was able to offer the statement that he was sorry." (R. 748-49.) Additionally, the full three-page statement, as transcribed by Daniel and signed by Petitioner, was introduced as a hearing exhibit.  (R. 762.)   The statement shows it was given at 1:49 p.m.

Officer Gibbs, who was present for the entire process, testified that Petitioner was responsive to questions and appeared to be alert and not under the influence of any drugs.

11

He said Petitioner never asked for an attorney and that neither officer suggested any answers to him or gave him any information.  (R. 602-03.)

Immediately after the interview with Daniel, Investigator David Turner took a statement from Petitioner regarding the checks written on the victim's account.  Turner testified that he first asked Petitioner if he had been advised of his rights and Petitioner said Daniel had advised him and he understood them.  Turner did not read the rights again.  Turner said he showed the checks to Petitioner, who acknowledged that he wrote each one.  Turner said Petitioner remembered where he wrote the checks, but not the check numbers.  Turner said he wrote out Petitioner's statement, and Petitioner signed it.  He said that, at the time, Petitioner was alert and coherent, did not appear to be under the influence of anything, and appeared to understand what was going on.  (R. 568-75.)

Defense counsel called several family members and acquaintances who testified that Petitioner had a drug problem and that they were concerned about him on the night of Cindi's death because they knew or suspected that he was buying and using drugs that night. (R. 611-81.)  One witness said Petitioner was "doing [drugs] all night till he ran out." (R. 649.)  Two inmates who observed Petitioner at the jail the evening after his arrest and statement said he appeared to be under the influence of something.  (R. 683-84, 690.)

Defense counsel also called a clinical psychologist, Dr. William Martin, to testify.  Dr. Martin said he had been asked to perform a forensic psychological evaluation of Petitioner, which was to include several interviews with Petitioner, a review of the relevant medical and police records, and performance of various psychological, intellectual and personality assessments.  At the time of the suppression hearing, Dr. Martin had not yet

completed his evaluation.   He said he had viewed the videotape of the statement read by the officer and acknowledged by Petitioner.  (R. 693-98.)

Dr. Martin explained that a person using crack cocaine experiences several levels of intoxication/detoxification, usually over a four to six hour period, depending on body chemistry and how the drug is ingested.  He said that cocaine is a stimulant and that free basing or smoking crack cocaine results in a "very, very powerful surge" or high that drops off within ten to thirty minutes but "leads to the absolute craving of more, and more, and more."  He said a user "binges" for a sustained period of time, during which his behavior is "disinhibited" and his judgment deteriorates, typically stopping only when he either runs out of money or available drugs.  With very high levels of drug ingestion, a user can experience hallucinations or delusions, including an increased potential for aggressive behavior.  Following the binge period, the user "crashes" as he goes through a period of detoxification.  Dr. Martin said Petitioner's behavior on February 9 and 10, as testified to by the witnesses, was consistent with a "relatively typical binge" period.  He said that, on the videotape, Petitioner displayed little verbalization, appeared upset and depressed, and had a sad facial expression and slumped posture.  He said Petitioner's behavior and demeanor could have been associated with a period of cocaine detoxification but also was consistent with the sort of emotional trauma and shock logically following arrest and being charged with a capital offense.   He said Petitioner's behavior on the tape was not consistent with cocaine intoxication.  (R. 700-17.)

Dr. Martin testified that he had reviewed the report of Dr. Paul Deyoub, a clinical psychologist who previously had interviewed and evaluated Petitioner.  Dr. Martin said he thought the report was an accurate description.  (R. 715.)  In the report (R. 93-98), Dr.

13

Deyoub diagnosed Petitioner with cocaine dependence and a personality disorder, but found (1) that he was aware of the nature of the charges and proceedings against him and was capable of cooperating effectively with an attorney in preparation of his defense and (2) that, at the time of the alleged offense, he did not suffer from mental illness and had the capacity to appreciate the criminality of his conduct, to conform his conduct to the requirements of the law, and to form the culpable mental state to commit the alleged crime. (R. 93, 97-98.)  Dr. Deyoub's testing resulted in a full-scale IQ score of 72, in the borderline range of intellectual functioning.  He said he thought that Petitioner's ability to organize material and respond to questioning was suggestive of a higher IQ ("as high as 80 or 85 with better concentration and effort") but that his scores may have been lower due to anxiety and apprehension about his situation and a desire to appear disabled.   (R. 96.)  The report states that Petitioner was twenty-five years old, graduated from high school, had recently started his own logging business, and was "coherent, verbal, cooperative and well organized."  (R. 95-96.)

The trial court found that, with respect to the statements given to Officers Turner and Daniel, Petitioner knowingly and intelligently waived his constitutional rights and gave the statements freely and voluntarily, and that the statements were therefore admissible at trial. (R. 760-64.)  In his direct appeal, Petitioner argued that the trial court's finding was erroneous.  The Arkansas Supreme Court held:

> For a review of the voluntariness of confessions, we make an independent determination based on the totality of the circumstances and reverse the trial court only if clearly erroneous.  *Everett v. State*, 871 S.W.2d 568 ([Ark.] 1994).
>
> Appellant submits that the combination of his cocaine intoxication and low IQ would be sufficient to render the waiver and the resulting confession

involuntary.  The factors to consider when there is a claim of alcohol or drug intoxication are set out in *McDougald v. State*, 748 S.W.2d 340 ([Ark.] 1988).[8]  When such a claim is advanced, the level of a defendant's comprehension is a factual matter to be resolved by the trial court.  *Anderson v. State*, 842 S.W.2d 855 ([Ark.] 1992).  In this case, the trial court heard defense witnesses' testimony (other inmates) who claimed that appellant was under the influence of cocaine at various times during and after his interrogation, and also heard testimony from the officers who had interrogated the appellant; the officers' testimony supported the trial court's finding that appellant was not under the influence of drugs, and the trial court obviously resolved the conflict in testimony in favor of the state. [Appellant's] claim of mental impairment is also without merit; a psychologist's report indicated that [appellant] was 25 years old, had graduated from Sparkman High School, and that at the time of the commission of the offense did not suffer from mental illness or lack the capacity to appreciate the criminality of his conduct.

*Rucker I*, 899 S.W.2d at 449-50 (parallel citations omitted; footnote added).

　　　　3.　　Analysis.

　　　　The "totality of the circumstances" standard recited and applied by the Arkansas Supreme Court, while resting on state law, is consistent with the governing United States Supreme Court precedents and, therefore, was not "contrary to" the applicable federal law under § 2254(d)(1).  *See Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (it is not necessary for the state court to cite, or even be aware of, applicable United States Supreme Court opinions, as long as "neither the reasoning nor the result of the state-court decision contradicts them").

_____

　　　　[8]As stated in *McDougald*, the test of voluntariness of one who claims intoxication at the time of waiving his rights and making a statement is "whether the individual was of sufficient mental capacity to know what he was saying – capable of realizing the meaning of his statement – and that he was not suffering from any hallucinations or delusions."  *Id.* at 341-43 (finding statement voluntary where officers testified that defendant did not appear to be intoxicated, and he was 24 years old, had graduated from high school, could read well and understand what he read, was held for less than an hour after his arrest before being questioned, was questioned only after his rights were read to him, initialed and signed the rights-waiver form and statement, was interrogated for only two or three hours, and was able to remember details of events other than his rights waiver).

Furthermore, the decision was not an objectively unreasonable application of the principles enunciated in the governing Supreme Court cases.  In support of his current claims, Petitioner again argues that his statement was involuntary because he was "coming down from [a] crack high," has a low IQ, and simply repeated information that he was spoonfed by the police.  He points to testimony that he did not respond to his name, was sniffling, and appeared to witnesses to be under the influence of drugs.  He also asserts that the statement was written by the interrogating officer and was inconsistent with later evidence from the medical examiner as to how the shooting occurred.  This, he says, shows that it was the "product of the police planting the information for him to regurgitate for them or from his being still under the influence of drugs or both."

At the state suppression hearing, Petitioner argued that his statements were involuntary because they were made under the influence of drugs to such an extent that he did not possess sufficient mental capacity to realize the meaning of his statements, intend them to be voluntary, nor knowingly and intelligently waive his constitutional rights. (R. 750-52.)  The trial judge implicitly rejected those specific arguments in denying the motion (R. 760-61), and later clarified that this was his holding, by saying at trial that he had earlier concluded Petitioner's statements were "free and voluntary and without the influence of any drugs or alcohol."  (R. 1995.)  The trial court thus clearly accepted the testimony of the officers that, at the time of the interview, Petitioner was coherent, cooperative and did not appear to be under the influence of any drugs to the extent that he was unable to know what he was doing, discrediting any evidence suggesting the contrary.  The trial court was also able to view the videotape and observe Petitioner's demeanor and condition immediately after giving the statement.  On the tape, he spoke

16

with the officers and asked a question.  On appeal, the state supreme court recognized that the level of a defendant's comprehension due to the effects of drug or alcohol is a factual matter, finding that the hearing testimony supported the trial court's resolution of the conflicting evidence.  *Rucker I*, 899 S.W.2d at 450.

This is the type of state-court factual determination that is entitled to a presumption of correctness in federal habeas proceedings.  *See Thompson v. Keohane*, 516 U.S. 99, 110-11 (1995) (presumption applies to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators," and to certain other issues where resolution "depends heavily on the trial court's appraisal of witness credibility and demeanor"); *Miller*, 474 U.S. at 112 (while voluntariness of a confession is a matter for independent determination in federal habeas proceedings, subsidiary factual questions are entitled to a presumption of correctness); *Thai v. Mapes*, 412 F.3d 970, 976 (8th Cir.), *cert. denied*, 546 U.S. 1039 (2005) (state court's finding that petitioner understood *Miranda* warning was presumptively correct factual finding); *Stevens v. Armontrout*, 787 F.2d 1282, 1284-85 (8th Cir. 1986) (whether defendant was intoxicated when he surrendered to police was factual issue entitled to presumption of correctness under habeas statutes).  Federal habeas review "gives federal courts no license to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."  *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

Other than arguing that the record evidence should have been evaluated differently, Petitioner has not presented any clear and convincing evidence to rebut the state courts' factual determination in this regard.  Moreover, the Court has carefully reviewed the suppression hearing testimony, as summarized in detail above, and finds that the credibility

determinations are reasonable in light of the evidence presented.  While Petitioner may have been experiencing some lingering effects as he "crashed" and the cocaine dissipated from his system, the evidence supports a finding that he retained sufficient mental capacity to know what he was saying and doing.  Therefore, this Court is bound under § 2254(e)(1) by the state courts' subsidiary factual finding that, at the time Petitioner waived his rights and gave his statements, he was not acting under the influence of drugs.

As support for his contention that the police fabricated his confession, Petitioner points to the statement that he shot the victim from six feet away, which he says was refuted by the medical examiner's later obtained opinion that it was a contact wound. Apparently, this particular argument was not made to the trial court at the suppression hearing (*see* R. 582-600, 750-52); therefore, it cannot be said that the trial court explicitly or implicitly rejected it.  Nevertheless, despite the inconsistency, the statement also shows that Petitioner told the police some things that they did not yet know and which were confirmed by their later investigation.  For example, he told them that he had gone home during the night and changed his shirt, he said the weapon used was a .22 pistol, he identified various businesses where he had forged checks, and he said he shot the victim when she was lying on the couch and later moved her body to the floor.[9]

It is also important to examine Petitioner's entire statement, which was provided to the court at the suppression hearing and, later at trial, to the jury.  (R. 762, 1920.)  At first, he told police that he had the pistol in his hand because he was going to take it to trade for cocaine, that he did not know it was loaded, that the victim was trying to take it away from

---

[9]These consistencies were pointed out at trial in the prosecutor's examination of the witnesses and in his closing argument.  (*E.g.*, R. 1921-25, 2292-94.)

him, that he "jerked it real hard and it went off," and that the victim then fell backwards onto the couch.  He then changed his statement to say he shot her from six feet away.  As is often the case, the truth is probably somewhere in between his two accounts.  It was the fact-finder's responsibility to resolve any inconsistencies.

In addition to supporting the presumptively correct finding that Petitioner was not intoxicated at the time he gave the statement, the record contains undisputed evidence that he was informed of his *Miranda* rights upon being detained, was again informed of his rights immediately before a statement was given less than an hour later, acknowledged the rights by signing the rights form, told officers that he understood his rights, listened while the officer read the statement on videotape, acknowledged on tape that the statement read was his statement, and asked on tape a question for clarification.  The record is devoid of any evidence that police resorted to physical or psychological pressure, threats or promises, improper interrogation tactics, lengthy questioning, trickery, deceit or intimidation to elicit statements from Petitioner.  *See Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) (it is permissible for police to elicit further statements from a defendant by claiming not to believe his denials).  The primary elements which Petitioner asserts as improperly inducing his statement (drug intoxication and low IQ) emanated from himself, rather than police. There is no constitutional "right of a criminal defendant to confess to his crime only when totally rational and properly motivated."  *Connelly*, 479 U.S. at 166 (holding suppression was properly denied notwithstanding psychiatrist's testimony that defendant was schizophrenic and in a psychotic state at least the day before he confessed).

In upholding the trial court's finding of voluntariness, the Arkansas Supreme Court looked at several factors:  inmate testimony that Petitioner appeared to be under the

19

influence of drugs around the time of his interrogation; contrary testimony of the

interrogating officers; the examining psychologist's report showing his age and educational

background; and the psychologist's finding that he suffered from no mental illness or lack

of capacity at the time of commission of the offense.  *Rucker I*, 899 S.W.2d at 450.  This

approach was proper and, as explained, is supported by the evidence.  Therefore, the

Arkansas Supreme Court's ultimate determination that Petitioner's statement was voluntary

was not contrary to, or an unreasonable application of, United States Supreme Court law,

nor was it based on an unreasonable determination of the facts in light of the state court

record.

      B.    <u>Failure to Videotape</u>.

      Petitioner next argues that his constitutional rights were violated because the police

failed to videotape his incriminating statement even though they had the wherewithal and

ability to do so.  He says the only inference that can be drawn from the police conduct is

that they did not want the prosecuting attorney, defense, court and jury to know what really

happened in the taking of the statement in this case.  He says this (1) violated his right

against self-incrimination and his right to due process under the Fifth and Fourteenth

Amendments to the United States Constitution, (2) amounts to spoliation of potential

evidence and interferes with his right to impeach and put on a defense, in violation of his

constitutional due process rights, because it withheld from the jury important facts about

taking of the statement, (3) removes the presumption of correctness of any state finding

of voluntariness or legality.  He asserts that he had a constitutional right to recording the

process because this was a homicide case where the death penalty was at issue.  In

support, he cites cases, statutes and administrative rules from several states requiring

videotaping of confessions, as well as endorsement of a recordation requirement by several legal associations and authorities.  He also submits a recommendation that he has made to the Arkansas Supreme Court Criminal Rules Committee, advocating adoption of a rule requiring electronic recording of most custodial interrogations (docket entry #20).

The first problem with Petitioner's argument is that he has never raised this claim in state court.  It is, therefore, procedurally defaulted.  Nevertheless, a greater obstacle lies in the limited scope of review available under the federal habeas statutes.  Petitioner is entitled to habeas relief on this claim only if the state-court proceedings resulted in a decision that was "contrary to, or involved an unreasonable application of, *clearly established Federal law, as determined by the Supreme Court of the United States.*"  28 U.S.C. § 2254(d)(1) (emphasis added).  Where the United States Supreme Court cases "give no clear answer to the question presented, let alone one in [the habeas petitioner's] favor," it cannot be said that the state court applied a rule that was "contrary to" or an "unreasonable application" of any clearly established federal law, as expressly required by the statute.  *Wright v. Van Patten*, 128 S. Ct. 743, 747 (2008).  *See United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir. 2004) ("[N]o one has intimated that [state laws requiring electronic recording of interrogations] were constitutionally required, and we see no hint that the Supreme Court is ready to take such a major step."); *see also United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005) (no constitutional requirement that police use written waiver form and tape-recording equipment); *Jenner*, 982 F.2d at 331 n.2 (noting that other circuits have held that incriminating statements are not inadmissible simply because the police failed to record or take notes of the conversations).

Moreover, Petitioner's argument that the failure to videotape was a deliberate effort to conceal his intoxicated condition is undermined by the videotaped signing and acknowledgment of the statement as his. It is undisputed that this occurred immediately after he gave the statement. If the police truly sought to hide Petitioner's condition, they would not have videotaped any portion of the interrogation process.

This claim provides no basis for federal habeas relief.

C.     Taking Voluntariness and Credibility Issues from Jury.

Petitioner alleges (1) that the trial court unconstitutionally refused to instruct the jury that the voluntariness of his statement was a question for the jury to decide, (2) that the trial and appellate courts unconstitutionally erred in determining that two witnesses (jail inmates who observed Petitioner's condition near the time of his interrogation) were not relevant or were cumulative, precluding him from presenting their testimony on the issue of his mental state at the time he gave his statement, and (3) that his trial counsel was constitutionally ineffective in failing to proffer an instruction that told the jurors they were the ultimate determiners of the voluntariness and truthfulness of a confession.

Respondent asserts that all of these claims are procedurally defaulted (docket entry #8, at 8, 11). Default is clear as to the first claim; however, Petitioner raised a variation of the second claim in his direct appeal (Resp't Ex. 2, at 223-25; *Rucker I*, 899 S.W.2d at 450), and a variation of the third in his Rule 37 post-conviction petition (Resp't Ex. 3, at 4; *Rucker II*, *supra* at *2-*3). Notwithstanding any procedural default, the claims do not entitle Petitioner to relief. *See Trussell v. Bowersox*, 447 F.3d 588, 591-92 (8th Cir. 2006) (because procedural default is not jurisdictional bar, court can deny claim on the merits in interest of judicial economy even if likely that claim is defaulted).

22

1.    Applicable Law.

In *Crane v. Kentucky*, 476 U.S. 683 (1986), the United States Supreme Court held that a criminal defendant was entitled, as a component of his fundamental constitutional right to a fair opportunity to present a defense, to present evidence at trial bearing on the voluntariness of a confession and on its credibility, even when there has been a pretrial determination that the confession was freely and voluntarily given. *Id.* at 687-88.   A pretrial voluntariness determination does not undercut the defendant's right to challenge the confession's reliability and truthfulness during the course of the trial.   *Id.* at 688.   The physical and psychological environment that yielded a confession is not only relevant to the legal question of voluntariness but can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence.   *Id.* at 689.   Confessions, even though found to be voluntary, are not conclusive of guilt and, "stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?"   *Id.*   Therefore, the Court held, the blanket exclusion of testimony about the circumstances of a defendant's confession deprives him of a fair trial.   *Id.* at 690.

2.    State Court Proceedings.

As stated, the trial court denied Petitioner's pretrial motion to suppress, finding his statements were freely and voluntarily given and, therefore, admissible at trial.  (R. 760-64.)  During trial, Petitioner sought to have the following instruction given to the jury:

> A confession made by Johnny A. Rucker in the presence of police officers is presumed to be involuntary, and the burden is on the state to overcome that presumption by a preponderance of the evidence.

(R. 2203.)  Defense counsel stated:

> We would offer this one, realizing that it can be argued by defense counsel; however, it is discretionary with the Court. ...  I think it's proper.

The trial court declined to give the instruction, stating:

> ... The Court, having conducted a hearing to hear the voluntariness or involuntariness of the confession and the Court making that determination, I feel that this instruction would not be proper in that the Court has already ruled on whether the statement was voluntary and the Court ruled that it was freely and voluntariily given.  For that reason, I would deny that, but I'll let you [proffer] it as 23B.

(R. 2193-94.)

In Petitioner's Rule 37 petition, he argued that the instruction offered by trial counsel was "improperly cast," leading the trial court to think that the instruction would allow jurors to ignore its preliminary determination of admissibility of the confession.  Petitioner argued that counsel instead should have offered an instruction that the jurors had the right to determine the weight of a confession and could disregard a confession if they believed it to be involuntary or unbelievable.  (Resp't Ex. 3, at 4.)  The Rule 37 court found that Petitioner suffered no prejudice because counsel was allowed to and did argue the weight of the confession to the jury.  (Resp't Ex. 4, ¶ 4.)  On appeal, the Arkansas Supreme Court rejected Petitioner's claim, stating:

> Counsel was not ineffective for not seeking to submit another instruction, or for electing not to argue the denial of the instruction on appeal. The Comment to AMCI 2d 200 provides:
>
>> Under Ark. R. Evid. 104, it is clear that the judge, not the jury makes the determination of admissibility of evidence; therefore, most evidentiary instructions will no longer be appropriate.  In other words, once the judge makes the determination that evidence is admissible, it will be a matter of argument of counsel as to the weight to be given that evidence.

> In *Jacobs v. State*, 744 S.W.2d 728 ([Ark.] 1988), we relied on an earlier version of this comment to affirm the trial court's denial of a non-AMCI instruction concerning a prior consistent statement. Accordingly, the Trial Court was correct to refuse to submit the non-AMCI instruction on the basis that the issue of the admissibility of the statement was already determined. If counsel had sought to submit another similar instruction, or raised the issue on appeal, neither would have been successful.

*Rucker II*, *supra* at *2-*3 (parallel citation omitted).

At his pretrial suppression hearing, Petitioner presented testimony from two inmates who were at the jail the day he gave his statements. The first was Russ Burbank, who said he observed Petitioner at the jail about 6:30 or 7:00 p.m. Burbank testified that Petitioner was "very distant" and "very removed from the situation," his eyes were glassed over, and he appeared to be "under the influence of something ... some form of chemical drug." Burbank testified that he had a degree in psychology, had supervised lots of people, and had terminated some employees because of drug or alcohol abuse. He acknowledged that Petitioner's appearance and demeanor could have been due to the fact that he had been up all day and the night before, was very tired, and was facing serious charges for the murder of his girlfriend. (R. 681-86.)

The second witness was James Howard, who said he had known Petitioner for over ten years. Howard testified that he saw Petitioner being booked at the desk between 5:00 and 5:30 p.m. and that he "didn't look like himself." He said he talked to Petitioner briefly about 7:00 p.m. and he seemed "different to me, and I don't know if it was drugs, or what had happened, or what all had transpired or – I don't know exactly what it was." He said it "seemed like [Petitioner] was on something" but Howard said he "didn't know for sure." He said the jailer asked Petitioner if he would mind sharing a cell with Howard and Petitioner seemed puzzled, as if he did not know who Howard was. (R. 687-92)

25

At trial, Petitioner's counsel attempted to call Burbank as a witness, saying that his testimony was relevant to the voluntariness of Petitioner's statements. (R. 1992-95). The trial court disallowed the testimony, saying it had already heard Burbank's testimony as to whether the statement was free and voluntary, that he was not an expert in this field, and that his observation of Petitioner's conduct was "after the fact." (R. 1993.) Petitioner's attorney proffered the testimony of Burbank and Howard from the suppression hearing. The court stated that it had considered the testimony of all witnesses at the suppression hearing and had concluded that Petitioner's statement was free and voluntary and without the influence of any drugs or alcohol. (R. 1995.) On appeal, the Arkansas Supreme Court upheld the ruling:

> The question of relevance is within the sound discretion of the trial court. *Simpson v. Hart*, 740 S.W.2d 618 ([Ark.] 1987).
>
> However, we have also addressed this issue in a number of cases and found that the purpose of the *Denno*[10] hearing (Ark. Code Ann. § 16-89-107 (1987)) is to prevent a jury from hearing a confession before the court determines whether it has been voluntarily given and not to restrict evidence after the court has made the determination of voluntariness. *Kagebein v. State*, 496 S.W.2d 435 ([Ark.] 1973). The defendant still has the constitutional right to have his case heard on the merits by a jury, including the weight and credibility the jury might give to the voluntariness of the confession. *Walker v. State*, 488 S.W.2d 40 ([Ark.] 1972). Here, the testimony of the two fellow prisoners would have been only cumulative, as there was other evidence presented, including the defendant's statements, that he was using drugs before and after the commission of the crime. Thus, the defendant has failed to show prejudice, and even if the exclusion of the testimony was error, it was harmless error in this instance.

*Rucker I*, 899 S.W.2d at 450 (parallel citations omitted).

---

[10]*Jackson v. Denno*, 378 U.S. 368 (1964).

3.     Trial Court's Refusal to Instruct Jury that Voluntariness was Jury Question.

As stated, *Crane* held that a criminal defendant has a constitutional right to present to the jury the question of how much weight should be given to a confession.  Petitioner identifies no United States Supreme Court precedent expanding *Crane*'s ruling to include the right to any particular jury instruction.   Moreover, in Petitioner's trial, no instruction consistent with *Crane*, or otherwise addressing the weight to be given a confession, was offered.  The instruction proposed by Petitioner stated that a confession "*is* presumed to be involuntary" and that the "burden *is* on the state" to overcome that presumption.  *Crane* did not, in any way, hold that, even after a pretrial determination of voluntariness, the jury must be instructed that the prosecution continues to have the burden of proving voluntariness, thus implying that the jury is to determine anew whether that burden had been met.  Fourteen years before *Crane*, in *Lego v. Twomey*, 404 U.S. 477, 489-90 (1972), the Supreme Court refused to impose a constitutional requirement that both judge and jury pass upon a voluntariness issue.  The voluntariness, and thus admissibility, of Petitioner's statements was properly determined before trial, and he was not entitled to resubmit that issue to the jury.  *Id.*  The trial court's refusal to submit the proposed instruction to the jury, when it had already made a pretrial determination of voluntariness, did not deprive Petitioner of a fair trial or of any constitutional rights articulated in *Lego* or *Crane*. Moreover, nothing in *Crane* suggests that, in the absence of a proffered instruction on assessing credibility of a confession, a trial court is required to sua sponte formulate such an instruction for submission to the jury.    Additionally, this Court is bound by the determination by the state's highest court that the proposed jury instruction would be improper under *state* law.  *Crump v. Caspari*, 116 F.3d 326, 327 (8th Cir. 1997).

27

Therefore, the trial court's refusal of Petitioner's instruction, and its failure to sua sponte fashion a different one, was not contrary to or an unreasonable application of any United States Supreme Court precedent.

4.      Ineffective Assistance of Counsel.

Petitioner argues that trial counsel should have offered an instruction that told the jurors they were the ultimate determiners of the voluntariness and truthfulness of a confession and that counsel's proffered instruction was "off the mark legally," constituting ineffective assistance.   The Rule 37 court found Petitioner suffered no prejudice from counsel's conduct because counsel was allowed to argue the weight of the confession to the jury.  The Arkansas Supreme Court agreed, holding that any rewritten instruction would have been rejected because, under state law, evidentiary instructions are not appropriate where the trial judge has made a pretrial determination regarding admissibility of a confession and that it is a matter of argument as to the weight to be given the confession. *Rucker II*, *supra* at *2-*3.

At the time the state courts ruled on Petitioner's claim, the United States Supreme Court had clearly articulated the standard for analyzing claims that a criminal defendant's counsel was constitutionally ineffective.   *See Strickland v. Washington*, 466 U.S. 668 (1984).   Under *Strickland*, the defendant must show that his attorney's conduct was professionally unreasonable under the circumstances and that this prejudiced his defense. An attorney's performance is deficient when it falls below "an objective standard of reasonableness."  *Id.* at 688.  The defendant is prejudiced by the inferior performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

28

In Petitioner's case, *Strickland*'s standard was cited and applied by the Arkansas Supreme Court in resolving his ineffective-assistance claim. *Rucker II*, *supra* at *2. The state courts did not unreasonably apply this standard in finding that the prejudice component was not satisfied where any rewritten instruction by counsel would have been rejected under state law. *Jenner v. Class*, 79 F.3d 736, 740 (8th Cir. 1996) (where state supreme court held that defendant was not entitled to accomplice instruction under state law, "there is no basis for ruling [in federal habeas action] that counsel was deficient for not proposing the instruction"). Furthermore, as stated above, *Crane* cannot be read as affirmatively mandating an instruction telling the jury to weigh the credibility of a defendant's statements.

Therefore, the state supreme court's decision rejecting this ineffective-assistance claim was not contrary to or an unreasonable application of any controlling United States Supreme Court law.

    5.    <u>Exclusion of Witnesses</u>.

Petitioner argues that the exclusion of witnesses Burbank and Howard violated his constitutional right to present a complete defense and have the validity and truthfulness of his confession fully evaluated by the jury, contrary to *Crane*, *Lego*, and *Denno*. As stated, the trial court excluded their testimony on the basis that, among other things, their observation of his condition came "after the fact." On appeal, the Arkansas Supreme Court found their testimony to be cumulative. In doing so, the supreme court recognized that the purpose of a pretrial *Denno* hearing on the voluntariness of a confession is not to restrict evidence at trial and that, even after a pretrial determination, "[t]he defendant still has the constitutional right to have his case heard on the merits by a jury, including the weight and

credibility the jury might give to the voluntariness of the confession." *Rucker I*, 899 S.W.2d at 450.

The Arkansas Supreme Court cited two state cases in support of its ruling, both of which expressly relied upon applicable United States Supreme Court precedents. *See Kagebein*, 496 S.W.2d at 440 (citing *Lego*); *Walker*, 488 S.W.2d at 41-42 (citing *Denno*). Although the state court did not refer to *Crane*, its decision was not contrary to, or an unreasonable application of, the principles enunciated there or in its predecessors, *Lego* and *Denno*.

No United States Supreme Court case holds that all evidence relating to the voluntariness of a confession must be allowed at trial. Instead, the Court in *Crane* surveyed the existing law and condemned the "blanket exclusion" of testimony about the circumstances of a confession. *Crane*, 476 U.S. at 687-91. The Court, however, emphasized that judges retain "wide latitude" in making their evidentiary rulings and may exclude "evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Id.* at 689-90. *See Greer*, 493 F.3d at 959-60 (distinguishing *Crane* where state court allowed defendant to present some evidence about the circumstances surrounding his pretrial statements to police and his state of mind, but excluded testimony that was "marginally relevant" and defendant was not "unduly prejudiced" in his attempt to explain the circumstances).

Additionally, the United States Supreme Court expressly held in *Crane* that harmless error analysis applies to the exclusion of defense evidence that rises to the level of a due process violation, directing the state court to address on remand the state's argument that the evidence excluded there ultimately came in through other witnesses.

30

*Crane*, 476 U.S. at 691.  On federal habeas review, harmless error analysis requires the federal court to determine whether any constitutional error had a "substantial and injurious effect or influence" on the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007) (*Brecht* test applies "whether or not the state appellate court recognized the error and reviewed it for harmlessness").

The Court has read the entire trial transcript, which reveals extensive testimony and argument regarding Petitioner's statements to the police.  As in the suppression hearing, the officers involved testified in detail about the circumstances surrounding the traffic stop and arrest (1:00 p.m.), transfer to the police department, questioning of Petitioner (beginning at 1:43 p.m.), and the giving of the statement (at 1:49 p.m.).  The jury was also presented with the actual statement, in which Petitioner told police that he had been buying and smoking cocaine most of the night and on the morning before his arrest.

The officers described Petitioner's appearance and demeanor (R. 1495, 1912), and the jury was able to view the videotape showing his condition (R. 1919).   During deliberations, the jury asked that the videotape be replayed.  Over Petitioner's objection,[11] the court permitted the viewing because it "would show his demeanor at the time [the statement] was given," which "would be good for both [sides]."  The court took special precautions to ensure that the replaying was not done in a prejudicial manner.  (R. 2302-10.)

Testimony was presented tracing Petitioner's activities from early evening on February 9, through his arrest the next day.  Witnesses testified that during those hours

---

[11]Counsel was concerned that replaying the video would put "too much weight" on it.  (R. 2303.)

he was observed using drugs, being "high," trading a gun and a camcorder for drugs or cash, and cashing or attempting to cash checks at various businesses.  In his statement to Daniel, Petitioner said he bought cocaine with all the checks he cashed, except the last one at the NAPA store in Gurdon.  The clerk at that store said he was in about noon.  (R. 1775-81.)  One witness, who testified that he smoked cocaine with Petitioner during the night and around 6:00 a.m. that morning, testified that smoking crack produced a "good rush" lasting two to ten minutes, then "you come down."  (R. 1863, 1874-75, 1895-97.)

Petitioner's family members testified again about his drug problem, their contacts with him that night and their concerns about his activities, and how he acted when he was on drugs.  (R. 1689, 1703-04.)

Defense counsel again called Dr. Martin to testify, saying the purpose of his testimony was to support the allegations about Petitioner's statements and to explain "how any drugs he may have ingested would have affected his ability to understand his rights, on the drugs, and would [have] affected even his judgment at that time."  (R. 1957.)  The prosecutor objected, saying the court had already ruled that the statements were admissible, and defense counsel said she had the right to present to the jury any factors that would affect the making of the statements.  (R. 1958.)  Dr. Martin was allowed to testify, again describing the effect of crack cocaine on an individual beginning with the "immediate and very powerful euphoric effect," lasting for ten to twenty minutes, then diminishing quickly.  (R. 1957.)  He said that, after about one hour, the cocaine remaining in the system would merely produce "irritability."  (R. 1974.)  However, he said, as soon as the initial high starts to go away, most crack cocaine users have "an almost uncontrollable urging to get that high again," leading to repeated usage ("one hit after another, after

32

another, after another") until the user is unable to obtain any more drugs. (R. 1968.) He said that, the more an individual is intoxicated, the more his judgment and logical reasoning deteriorate, and the individual's behavior becomes "disinhibited," disorganized and chaotic. (R. 1968-70.) After a series of hits over a period of hours, an individual can develop paranoia and is no longer able to "clearly organize, understand, and act." (R. 1974.) He testified again that the typical pattern of cocaine use involves a "binge" of repeated hits, lasting as long as the resources are available to get more of the drug, followed by a "crash" or low period, characterized by depressed thinking processes and motor behavior, diminished energy, and blunted alertness. (R. 1977, 1987).

Dr. Martin again testified that he had interviewed Petitioner and had viewed the videotape of the statement read by the officer and acknowledged by Petitioner. (R. 1961-62.) He said Petitioner had an IQ of 77, which was in the borderline range and seemed to be "a reasonably accurate estimate of his intellectual functioning." (R. 1962, 1965-66.) Dr. Martin said that, on the videotape, Petitioner's physical posture was "slumped," and he appeared tired, which was not consistent with cocaine intoxication but instead indicated a "crash" following an extended period of having stimulants in his system. (R. 1978-79, 1984, 1986-87.) On cross-examination, he acknowledged that being arrested for murdering one's girlfriend could also lead to a "deep depression." (R. 1990.) He also acknowledged that, on the videotape, Petitioner responded to questions, asked for a clarification, then answered coherently. (R. 1991.)

In defense counsel's closing argument, she attacked the believability of Petitioner's statements, described the circumstances surrounding the statements, pointed out that Petitioner had "purportedly" given several statements, that they were inconsistent with each

other and with the physical evidence, and that the statements were in a police officer's words and handwriting instead of Petitioner's. She questioned whether Petitioner made a statement at all. She pointed out that Petitioner was on drugs at the time and no drug test was given, she urged the jury to make its own assessment of Petitioner's condition based on the video, and she emphasized the expert testimony as to the effects of cocaine use. She argued that a confession alone was not evidence of guilt, that the jury had to first find that a crime had been committed, that the jury was not required to set aside its common sense in evaluating the evidence, and that the jury should consider the evidence as a whole. (R. 2254-60, 2275, 2284-85, 2288-89.)

The members of the jury were instructed by the trial court that they were not required to set aside their common knowledge, that they were the sole judges of the weight of the evidence and the credibility of the witnesses, and that a confession would not warrant a conviction unless accompanied by other proof that the offense was committed. (R. 2208, 2215.)

It is clear that substantial evidence was presented regarding the circumstances of Petitioner's statements. Burbank and Howard observed Petitioner three to five hours after his interviews with the officers. Their interaction with him was brief and, although their testimony suggested unusual behavior by Petitioner, neither was able to definitively attribute it to intoxication. One conceded that his behavior could have been due to stress and lack of sleep as opposed to the effects of drugs, and the other said he did not know what caused Petitioner's conduct and demeanor.

Unquestionably, Petitioner's statements to the police were the most important part of the prosecution's case. However, in light of the extensive testimony regarding the

circumstances of Petitioner's statements, the clear instructions to the jury that a confession was not determinative of guilt, the relative weakness of the excluded witnesses' testimony, and defense counsel's vigorous arguments regarding the credibility of Petitioner's statements, this Court finds that the state courts' exclusion of the witnesses was not contrary to or an unreasonable application of *Crane* or any other Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the trial evidence. The Court further finds that, if any error occurred due to the exclusion of the witnesses, it did not have a substantial and injurious effect or influence on the verdict, thereby constituting harmless error.

D.   Standard of Appellate Review of Confessions.

Petitioner also argues, in a supplemental brief (docket entry #21), that the Arkansas Supreme Court's standard for reviewing the voluntariness of confessions must be corrected because, although the court purports to conduct an "independent review," it is in reality applying a clearly erroneous standard to the ultimate question of voluntariness. Petitioner contends that the Arkansas Supreme Court should "jettison" all of its prior case law and instead adopt a standard paralleling the *de novo* review of warrantless searches set forth in *Ornelas v. United States*, 517 U.S. 690 (1996). Petitioner's counsel asserts that he has raised this issue in a criminal case currently pending before the Arkansas Supreme Court and "just figured out" that it applies here.

This claim is procedurally defaulted. Although Petitioner contends that this is simply a reformulation of claims he raised in state court, nothing in the section of his appellate brief addressing the confession issues resembles this claim. (Resp't Ex. 2, at 28-31.) The fact that counsel recently deduced that such a legal argument could be made in

Petitioner's case does not constitute cause excusing his default.[12]  Principles of comity clearly weigh against this Court addressing an issue with such far-reaching implications without first allowing the state courts an opportunity to do so.


IV.
Ground 2: Fingerprint Testing

Next, Petitioner asserts that he has a constitutional right to due process and a right to present a defense by having the fingerprints on the murder weapon checked against AFIS or against three individuals.  His argument is twofold.  First, he asserts that the state courts' determination that he was not entitled to the testing under the state habeas statute is unreasonable and entitled to no deference.  Second, he asserts that he has a due process right for this Court to order the testing that the state courts denied.  (*See* docket entries #3, at 27-30; #16, at 13-15.)

A.      State Court Proceedings.

At Petitioner's 1993 trial, the .22 caliber Ruger pistol that was found in the victim's hand was admitted into evidence, and the testimony established that it was probably the murder weapon.[13]  At the time of trial, Ralph Turbyfill was the chief latent fingerprint examiner for the Arkansas State Crime Laboratory.  He testified that he examined the weapon and tested it for fingerprints using the "super glue method," which involves putting

---

[12]As explained later, Petitioner's actual-innocence claim does not excuse any procedural defaults.

[13]A spent hull found in the room was determined to have been fired from the Ruger pistol. The state crime lab's firearms specialist testified that the bullet recovered from the victim's head was a .22 caliber bullet, but was too damaged to determine the specific weapon from which it was fired.  (R. 1478, 1811-13, 1822-23, 1907.)

the gun in a closed container with a "super glue" substance, then heating the glue.  As the glue vaporizes, fumes adhere to the moisture content left behind by fingerprints.  (R. 1784; State Habeas Tr. 59-60.[14])  Turbyfill said he tested the outside of the gun, the trigger and the magazine.  (R. 1788.)  As to the results, he said, "[T]here were no fingerprints of value for identification on the weapon.  It was not that [it] hadn't been handled.  It was just those fingerprints that were there did not have sufficient credit for identification purposes."  Turbyfill said that was not unusual, particularly where an item has been handled more than once in the same place, by the same hand, rendering the fingerprints or palm prints unidentifiable.  He said it was also possible that prints could have been wiped off, because fingerprints are "very fragile evidence" and are "easily destroyed."  (R. 1784-85.)  He explained that there were "indications" the gun had been handled but he was unable to discern if these were fingerprints or palm prints, and he was unable to discern to whom the prints belonged.  (R. 1788.)  Turbyfill also examined Petitioner's ink fingerprints.  (R. 1786.)  While he conceded that he did not find Petitioner's fingerprints anywhere on the weapon, he qualified his response by saying he found "no identifiable fingerprints."  (R. 1788-89.)

In October 2001, Petitioner filed a state petition for writ of habeas corpus seeking retesting of the gun for fingerprints, based on Arkansas's newly enacted Act 1780, which authorized issuance of a writ of habeas corpus based upon new scientific evidence proving a person actually innocent of the offense for which he was convicted.  Ark. Code Ann. §§ 16-112-103(a)(1), 16-112-201(a).  Under the statute in effect at the relevant time, a person seeking testing due to newly developed technology first had to demonstrate a *prima facie*

---

[14]The transcript of the state habeas hearing is attached to docket entry #12.

case showing that identity was an issue at trial, as well as a sufficiently reliable chain of custody regarding the evidence to be tested.  *Id.* § 16-112-202(b) & (c)(1)(A).  Once those requirements were met, testing would be ordered if the petitioner showed: (1) that the testing "has the scientific potential to produce new noncumulative evidence materially relevant to the defendant's assertion of actual innocence," *id.* § 16-112-202(c)(1)(B); and (2) that the testing requested "employs a scientific method generally accepted within the relevant scientific community," *id.* § 16-112-202(c)(1)(C).

In his state habeas action, Petitioner contended that the trial testimony excluded him as having left the prints and that the test results might enable him to assert a defense alleging that the prints on the gun belonged to one of three other individuals he contends were present on the night of the murder.  In January 2005, the circuit court held an evidentiary hearing.  At that time, Turbyfill had retired and Roy J. Reed was the chief latent prints examiner.  Reed testified at the hearing as to his interpretation of Turbyfill's findings and as to the technology available for testing fingerprints.  The circuit court denied relief (State Habeas Tr. 109-10), and Petitioner appealed.  The Arkansas Supreme Court affirmed, stating:

> The evidence presented at the hearing on the Act 1780 petition was that the Arkansas State Crime Laboratory has had access to AFIS since 1996.  The AFIS database, and another database, which the crime lab would soon be able to access, allows the State to submit a fingerprint for comparison with a large number of prints contained within the database, provided that the print meets certain criteria.  This allows the fingerprint examiner to use the computer to select a small number of potential matches, which can then be examined manually to determine whether a match does exist.  Without question, the AFIS system has provided new technology that allows many more fingerprints to be compared to crime scene prints, and it is a significant advancement.

38

There was additional testimony at the postconviction relief hearing, however, concerning the quality of the prints on the gun.  The expert who testified indicated that a print would have value for comparison purposes if it had seven points of minutia, or characteristics.  While there may be some prints that are unique so that a match could be confirmed on less points of minutia, this was a rare enough occurrence that the expert had not seen such a unique print within his 25 years of experience.  The testimony at trial had been that there was evidence the gun had been handled, but that the prints on the gun were not of value for comparison, and that the fingerprint examiner at trial had not been able to discern whether the prints were fingerprints or palm prints.  The expert at the hearing was familiar with that examiner's work, and believed that his statements indicated that he was not able to identify seven points of minutia in the prints.

When questioned concerning the technology available to improve the quality of the prints, the expert witness testified that it was now possible to enhance the print, so that what is faint is more discernable, but that there was no method to increase the number of minutia.  With less than seven minutia, the expert testified that the possibility of making identification was remote.  The AFIS system would accept a print with less than seven minutia, but the probability of an identification was still extremely low because the number of minutia was not sufficient.

Appellant concedes in his brief that he carried the burden to make the requisite showing under section 16-112-202(c)(1)(B).  Appellant has not shown that AFIS, or any other new technology, would produce an identifiable print.  While appellant argues that AFIS provides for enhancement of the prints to be loaded, appellant has not shown that the prints on the gun may have the minutia required for identification, even if enhanced.  In fact, the expert witness believed the testimony at trial indicated there were likely not to have been seven points of minutia.

Under Act 1780, testing is not authorized based on the slight chance it may yield a favorable result, and scientific testing of evidence is authorized only if testing or retesting can provide materially relevant evidence that will significantly advance the defendant's claim of innocence, in light of all the evidence presented.  *See Johnson* [*v. State*], 157 S.W.3d [151, 161 (Ark. 2004)].  Here, appellant did not provide evidence of more than a slight chance new evidence would yield a favorable result, or any result.  We cannot say the trial court clearly erred in determining appellant failed to meet his burden of proof.  Accordingly, we must affirm the order denying retesting of the gun to identify fingerprints.

*Rucker V*, *supra* at *2-*3 (parallel citation omitted).

B.     Reasonableness of State Court Decision.

Petitioner first argues that the state courts' determination that he failed to make a showing that further fingerprint testing had the "scientific potential" to produce new evidence is unreasonable and entitled to no deference.  In support, he says: (1) the court's determination is contrary to the hearing evidence; (2) since the hearing, new technology has been obtained and should be used to test the weapon; and (3) by refusing to retest the gun, the state is unconstitutionally denying him a meaningful opportunity to present a complete defense.

As he did in state court, Petitioner suggests here that the trial testimony established that his fingerprints were not on the gun at issue (*e.g.*, docket entries #3, at 4 n.2 & 16; #16, at 13).  As pointed out by the Arkansas Supreme Court, this is an inaccurate characterization of the print examiner's testimony:

> The expert did state that he did not find appellant's prints on the gun.  He made that statement, however, after he clearly stated that he could not discern to whom the prints on the gun belonged.  We cannot say that his testimony clearly excluded the possibility that the prints that could not be identified might have belonged to appellant, if identification was possible.

*Rucker V*, *supra* at *1.  The Arkansas Supreme Court's characterization more accurately describes Turbyfill's testimony as set forth above (R. 1788-89), has not been rebutted by clear and convincing evidence, and is, therefore, binding on the Court's analysis here pursuant to § 2254(e)(1).

At the state habeas hearing, Reed testified that the state crime lab obtained access to AFIS in 1996, which enables fingerprints to be compared by computer against a database of about 600,000 prints, and was in the process of linking into the FBI's even larger database (IAFIS), containing more than 30 million prints.  (R. 61, 63-69.) He testified

that, in his opinion, Turbyfill's trial testimony that there were "no fingerprints of value for identification on the weapon" meant that the prints did not have a sufficient number of characteristics, or minutia, to be of value for comparison purposes.  (State Habeas Tr. 60-61, 79.)  He testified that, to run a print through the AFIS screening system, it had to have at last seven points of minutia, which includes "ridges, bifurcations, islands, enclosures – that type of stuff."  (*Id.* 61.)  He also said that, as general rule, most certified latent print examiners in the United States require seven or eight characteristics before a print is considered identifiable.  (*Id.* 78, 90.)  He said it was possible that a print would be so unique that it would not need seven points but that, in his twenty-five years, he had never seen such a print.  (*Id.* 61, 89.)   He said the fact that Turbyfill could not tell if the prints were fingerprints or palm-prints meant there was "limited minutia" and perhaps no minutia at all.  (*Id.* 80.)

Reed was asked if any science had developed in the eleven years since Petitioner's trial that would make the prints on the gun any more identifiable than they were then.  He responded that there was no technology that would "make minutia happen that's not there," then said:

> We can enhance them with digital imaging techniques.  We can take some of the background away, or increase the contrast, but as for adding stuff that we can see to begin with, if it's just plain not there, I can't add to it.  If it's very faint, I can maybe enhance it, but that's the extent of it.

(*Id.* 75-76.)

Reed testified that the current screening system would not allow a print with less than seven minutia to be checked against the database of prints but that, with a new upgrade the lab was in the process of obtaining, a print with fewer minutia could be run

through the system.  (*Id.* 64-65, 78-79, 85-86.)   He said, however, that the chances of making an identification with five or six minutia was "very thin," unless the print was "so unique that that's all there was," and that he would be uncomfortable making an identification with less than seven.  (*Id.* 74, 80-81, 86.)

This state court record supports the Arkansas Supreme Court's conclusion that Petitioner failed to "provide evidence of more than a slight chance new evidence [from further testing] would yield a favorable result, or any result," thus failing to meet his burden of proof under the statute.  *Rucker V, supra* at *3.  Therefore, he has not shown that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, as required under § 2254(d)(2).

Petitioner argues that Reed's testimony never excluded the possibility that he could get a fingerprint that could be compared through the use of new software that the state crime lab would be acquiring in July 2005.  Petitioner asserts that, since the 2005 hearing, "we have learned that fingerprint testing now uses computer software to take distorted prints and attempt to recreate or restore the fingerprint to what it should look like undistorted.  Then, the fingerprint is tested through AFIS or manually compared to a known exemplar" (docket entry #3, at 27-29).

The fact that new technology may have been obtained after the hearing date has no effect on the analysis under § 2254(d)(2), which requires the habeas court to view any factual determinations "in light of the evidence presented in the State court proceeding." *See Holland v. Jackson*, 542 U.S. 649, 652 (2004).  The testimony set forth above shows that Reed never said new software was being obtained that would add points of identification to a print, only that there was an upgrade that might allow a print with fewer

points of identification to be checked against the database.  Moreover, just because such a print could be run through the system would not mean that any results would be obtained or that they would be reliable, as Reed testified that he would not be comfortable with anything less than seven and he felt the chances of making an identification were "very thin."

Nor has Petitioner shown that the state habeas court's decision was contrary to or an unreasonable application of established United States Supreme Court law under § 2254(d)(1).   The Supreme Court has clearly stated that the police do not have a constitutional duty to use any particular investigatory tools or perform any particular tests. *Arizona v. Youngblood*, 488 U.S. 51, 58-59 (1988).   Furthermore, there is no Supreme Court decision announcing a constitutional right to pursue a collateral attack on a state-court conviction after a defendant has failed to secure relief through direct review, *see Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987), much less establishing a constitutional right to post-conviction testing of physical evidence based on whatever technological advances may have occurred since a conviction became final.   *See McKithen v. Brown*, 481 F.3d 89, 106-08 (2d Cir. 2007) (directing district court to consider whether prisoner possesses residual post-conviction liberty interest in accessing potentially exonerative biological evidence), *cert. denied*, 76 U.S.L.W. 3113 (U.S. Feb. 19, 2008); *Grayson v. King*, 460 F.3d 1328, 1336-43 (11th Cir. 2006) (discussing possible sources of such a right but ultimately declining to weigh in on "the thorny threshold issue" and holding that prisoner had asserted no constitutional right to DNA testing of biological evidence under the factual circumstances of his case), *cert. denied*, 127 S. Ct. 1005 (2007); *Harvey v. Horan*, 278 F.3d 370, 375-76 (4th Cir. 2002) ("Establishing a constitutional due process right ... to

retest evidence with each forward step in forensic science would leave perfectly valid judgments in a perpetually unsettled state."). Therefore, the state's failure to pursue fingerprint testing for individuals other than Petitioner – before trial or upon the development of new testing technology after conviction – does not directly implicate any clearly established Supreme Court law.

Petitioner contends that the state habeas court's decision denying further testing is an unreasonable application of settled law governing his due process right to put on a complete defense, citing *Holmes v. South Carolina*, 126 S. Ct. 1727 (2006); *Chambers v. Mississippi*, 410 U.S. 284 (1973); and *Washington v. Texas*, 388 U.S. 14 (1967). "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690 (citations omitted). The cases cited by Petitioner all hold that this constitutional right cannot be abridged by state evidentiary rules that exclude important defense evidence without serving any legitimate interests. *Holmes*, 126 S. Ct. at 1731-32 (discussing *Chambers*, *Washington* and others). These decisions are inapposite.

First, the constitutional protection upheld in the referenced cases was applied to a defendant's rights *at trial*, not in state post-conviction proceedings years later. Petitioner identifies no authority which extends a defendant's right to present a defense to state post-conviction proceedings. Second, the cases all involved direct appeals, whereas the instant case implicates a collateral attack on a state criminal conviction through federal habeas proceedings. This is significant because federal habeas review is far more limited, as explained earlier, than the scope of direct review. *See Daniels v. United States*, 532 U.S.

44

374, 381 (2001).  Third, there were no rulings of the state trial court contrary to the cited federal precedents.  The trial court did not exclude any evidence Petitioner sought to obtain or introduce regarding the fingerprinting or the police's investigatory processes, nor was he prevented from cross-examining police officers or crime lab officials about the methods employed.  The trial court did not prevent Petitioner from performing any tests, requesting that they be performed, or introducing the results of any testing or evaluation.  Petitioner was never prevented from presenting evidence or argument suggesting guilt on the part of individuals other than himself.  In fact, the trial court denied the state's pretrial motion to exclude evidence of possible third-party guilt.  (R. 868-69.)  *See Holmes*, *supra* (defendant denied fair trial by state trial court's arbitrary application of rule excluding defense evidence of third-party guilt); *Chambers*, *supra* (defendant denied fair trial by state court's use of rules to exclude third party's self-incriminating statements and to refuse to permit defendant to cross-examine third party); *Washington*, *supra* (defendant's right to put on a defense violated by state rule barring him from calling as a witness a person who had been charged and previously convicted of committing the same murder).

The thrust of Petitioner's argument here is that any prints on the gun should be compared to those of three individuals who, he says, had motive and opportunity to kill the victim and no alibi for the time in question.  The evidence is clear that the technology existed at the time of trial to make manual comparisons with the prints of specific individuals (State Habeas Tr. 86), a point that Petitioner concedes (docket entry #16, at 15).  In fact, Petitioner expressly argued at trial that evidence had been presented linking other individuals to the victim's death and suggesting a suicide, pointing out that the police never checked the gun for fingerprints of the victim or a man named Bubba Brim.  (R.

45

2266-67.)  Furthermore, the state's failure to utilize the expanded AFIS database that the state crime lab obtained years after trial obviously cannot be the basis for a claim that Petitioner was denied the right to present his defense at trial.

Additionally, to the extent the Arkansas Supreme Court's decision turns on an interpretation of the state habeas statute, this Court lacks authority to consider whether that decision was a correct application of state law.  A federal court may issue a writ of habeas corpus only when a conviction violates the Constitution, laws or treaties of the United States.  28 U.S.C. §§ 2241, 2254.  It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see Ford v. Norris*, 364 F.3d 916, 919 (8th Cir. 2004) ("As the supreme judicial authority of the state, [the Arkansas Supreme Court] decides what state law is, an issue which cannot itself be reviewed in a federal habeas proceeding."). Therefore, whether the state habeas court properly interpreted and applied the state habeas statute is not a matter for a federal court to decide.  *See Evenstad v. Carlson*, 470 F.3d 777 (8th Cir. 2006) (federal habeas court could not review whether state courts erred in considering petitioner's post-conviction claim regarding new evidence); *see also Leaks v. State*, __ S.W.3d __, 2007 WL 4200202 (Ark. Sup. Ct. Nov. 29, 2007) (where petitioner had confessed to the crime of conviction, he could not later claim actual innocence for the purpose of obtaining scientific testing under Act 1780).

Finally, assuming that Petitioner could demonstrate the existence of some clearly established due process right to post-conviction forensic testing, it is clear that he was afforded adequate procedural protections under the circumstances.  *See McKithen*, 481 F.3d at 106-08 (in analyzing procedural due process claim seeking post-conviction access

to potentially exonerative biological evidence for DNA testing, court should consider the availability of state or federal statutory avenues for seeking DNA testing, and the seriousness of the crime and sentence involved).  Arkansas has enacted a statute that permits post-conviction access to evidence for fingerprint testing in limited circumstances.  Through counsel, Petitioner petitioned the court for relief under this statute in the appropriate state circuit court.  The state circuit court held an evidentiary hearing and provided him with the opportunity to present witnesses and other evidence, make all desired arguments, and test the state's opposition.  Relief was denied and, as explained, the decision was supported by the hearing evidence.  Petitioner appealed, receiving a full review by the Arkansas Supreme Court.  If the circuit court did not apply the statute appropriately, the state supreme court would have crafted the appropriate relief by remand, as it had done at an earlier stage of the proceedings.  *See Rucker IV & V*, *supra*.  It is significant that Petitioner was not seeking exonerative and often definitive DNA testing.  Instead, he was seeking retesting of prints which were of poor quality to begin with, a defect that Petitioner failed to show could be remedied by any new technology.  The presence of the victim's or a third party's fingerprints on the gun would not necessarily exclude Petitioner as the murderer, particular in light of his confession which the state courts had found to be voluntary.  Notwithstanding the denial of his requested relief, Petitioner has not identified any decision by the United States Supreme Court – or any other court – which entitles him to more procedural protections than he was afforded.

In summary, Petitioner has not established that the state habeas courts' decision was based on an unreasonable determination of the facts in light of the hearing evidence

or that it was contrary to or an unreasonable application of any governing United States Supreme Court precedent.

      C.    <u>Right to Testing in Federal Habeas Proceeding</u>.

Next, Petitioner argues that he has a due process right for this Court to order retesting of the weapon because of the likelihood that another person will be identified as having left fingerprints on the murder weapon.

Unlike the usual civil litigant in federal court, a habeas petitioner is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1977). Granting discovery is left to the discretion of the Court and may be authorized upon a showing of good cause. *Id.*; Rule 6(a), Rules Governing § 2254 Cases in United States District Courts. Additionally, a federal habeas court may permit the parties to expand the record by submitting additional materials relating to the claims. § 2254 Rule 7.

Petitioner first contends that the Court ordered this discovery in the prior habeas action. The Court's first order was no broader than requested by Petitioner in his motion for discovery. The motion asked the Court to permit discovery, stating that Petitioner's family had made a financial commitment to have scientific testing done by a private crime lab on the gun and the checks and that the Arkansas state crime lab "may be willing" to undertake the testing. Petitioner did not ask the Court for an order directing the state to release any evidence for testing or directing the state crime lab to perform any testing. The Court's order merely permitted Petitioner to proceed. Petitioner later submitted a more detailed motion for discovery, seeking a wide range of materials to support his claim of actual innocence. The motion was denied because the Court dismissed the habeas petition without reaching Petitioner's actual-innocence claim. The Court's order of

dismissal simply allowed Petitioner to return to state court to pursue his state habeas remedy under Act 1780.  (*See* No. 5:99cv0025, docket entries #9, #11, #16, #20, #25.)

The next inquiry is whether Petitioner has shown "good cause" for the requested discovery here.  Importantly, he does not ask to introduce or obtain already existing evidence through traditional discovery mechanisms; instead, he asks this Court to order that a state exhibit from his 1993 trial be subjected to forensic testing so that he can, hopefully, *create* new evidence to support a federal habeas claim.  As explained, the state court testimony was that the prints on the weapon were not of sufficient quality to be identifiable, either by manual comparison or by using a computer program to check them against a database of prints.  Petitioner presents no evidence in support of his assertions that new technology has been developed which could result in enhancement of unidentifiable prints, or that it would be effective for the prints at issue.  Assuming the prints were of sufficient quality to be re-evaluated, testing could again be inconclusive, could show the victim's prints (which would not be surprising because the gun was found in her hand), could show the presence of an unknown party's prints, or could confirm that the prints belong to Petitioner.  The best-case scenario for Petitioner would be for retesting to identify the presence of a particular third party's prints on the weapon at issue.  Assuming further that this was the result, would he then be entitled to federal habeas relief?

As this Court sees it, the key is whether Petitioner would be allowed to submit the newly obtained test results here in support of any of his federal habeas claims.  *See Mark v. Ault*, 498 F.3d 775, 788-89 (8th Cir. 2007).  When a habeas petitioner seeks to expand the record by introducing evidence beyond the existing state court record, he must satisfy the statutory prerequisites for holding an evidentiary hearing, as set forth in 28 U.S.C. §

2254(e)(2).   *Id.* at 788.   This statute sharply limits a federal habeas court's power to conduct an evidentiary hearing.   *Cox v. Burger*, 398 F.3d 1025, 1030 (8th Cir.), *cert. denied*, 126 S. Ct. 93 (2005).   A federal habeas court is "not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams*, 529 U.S. at 437.

Under § 2254(e)(2), where a habeas petitioner has failed to develop the factual basis of his claims in state court proceedings, the federal court "*shall not*" hold an evidentiary hearing unless the petitioner shows (1) that his claims rely on "a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court" (which is not alleged here), or on "a factual predicate that could not have been previously discovered through the exercise of due diligence," *and* (2) that "the facts underlying the claim[s] would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."   28 U.S.C. § 2254(e)(2) (emphasis added).

Petitioner has not made the requisite showing.   As stated, he first seeks manual comparison of existing fingerprints with those of individuals who were known – *at the time of trial* – to have had some connection to Petitioner and/or the victim on the night of the murder.   He failed to seek this comparison in the pretrial, trial or Rule 37 post-conviction phases of his state court proceedings.   Petitioner presented evidence and made arguments at trial showing that he recognized the possibility of alternate suspects.   He has not demonstrated here that, if he had diligently pursued such testing at the appropriate time, he could not have procured the results he now seeks.

The expanded AFIS database was not available to Petitioner at the time of trial. However, he has shown only a remote possibility that some unidentified suspect – not earlier considered by police or Petitioner – would be discovered by running the existing prints through the larger database.  He has not shown that the prints were of sufficient quality to run through the system or that, if the prints were able to be checked against the database, any results obtained could be deemed reliable due to the lack of sufficient identifying characteristics.

Furthermore, any results obtained through retesting of the weapon would have to be considered in light of the existing evidence, including Petitioner's voluntary statement to police that he shot the victim with the gun, as well as the uncontroverted testimony that he was at the victim's trailer off and on the night of the murder, he was high on cocaine most of the night, his family and friends were concerned about his behavior, and he was driving the victim's car around town through the night and the next day, cashing forged checks on her account and trading her possessions for more drugs.  The presence of someone else's fingerprints on the weapon would not necessarily mean that Petitioner was not also present, nor would it mean that he did not shoot the victim as he stated.  In light of this record, his current allegations fail to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty.

Petitioner also relies on *Toney v. Gammon*, 79 F.3d 693 (8th Cir. 1996), where the Eighth Circuit directed that biological samples be released to the petitioner so that he could conduct DNA testing.  *Toney* was decided before enactment of § 2254(e)(2).  Furthermore, the testing sought by the petitioner in *Toney* may well have exonerated him of the rape for which he had been convicted due to the definitive nature of the blood-testing and the weak

evidence against him, i.e., his protestations of innocence and mistaken identity, an equivocal identification by the rape victim, and a striking dissimilarity between his physical characteristics and the description given by the victim and another witness.  Here, as explained, Petitioner voluntarily confessed to shooting the victim and the requested fingerprint testing would not exonerate him.

As set forth earlier, there is no federal constitutional right to post-conviction forensic testing.  The case law regarding potentially exonerative DNA testing is evolving in this area, particularly in cases where the death penalty has been imposed.  Petitioner had state remedies available to him for seeking the desired testing, which he unsuccessfully pursued.  For the reasons explained above, Petitioner has not demonstrated that he has a due process right to have this Court order retesting of the weapon at issue, nor has he demonstrated that this is an appropriate case for the Court to permit, much less compel, the speculative fingerprint testing that was denied by the state courts.

V.
Ground 3: Juror Misconduct

Petitioner's final claim is that juror misconduct created a biased jury because three jurors withheld from the trial court and the parties that they had a close relationship with the victim or the prosecutor, denying Petitioner a fair trial under the Sixth Amendment and due process of law under the Fourteenth Amendment (docket entries #3, at 30-32, #16, at 15).  Specifically, Petitioner contends that: (1) Timothy Lamb said the victim was "just [an] acquaintance" (R. 913), when the relationship was much closer; (2) Kathryn Hesse said she knew the victim's family (R. 1263), when she actually knew them fairly well; and

52

(3) Cena Higgs said she knew the attorneys for both sides and had answered the telephone at the prosecutor's office for three weeks (R. 1310-13), when she was actually the prosecutor's daughter's best friend.

It is undisputed that these claims were never presented to the state courts and are, therefore, defaulted.   As cause, Petitioner blames his counsel's deficient voir dire examination, saying counsel failed to probe deeply enough in the relationships that were admitted.  He says he could not have raised this as an ineffective-assistance claim in his Rule 37 post-conviction proceedings because he did not discover the extent of the relationships until after the Rule 37 ruling.

While ineffective assistance of trial or appellate counsel may constitute cause to lift a procedural bar, *Murray*, 477 U.S. at 488; *Williams v. Kemna*, 311 F.3d 895, 897 (8th Cir. 2002), a habeas petitioner cannot rely upon ineffectiveness of counsel as cause to excuse a procedural default where he has not properly presented that ineffectiveness claim to the state courts.   *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (ineffective assistance of counsel asserted as cause for procedural default of another federal claim can itself be procedurally defaulted); *Interiano*, 471 F.3d at 856-57; *Williams*, 311 F.3d at 897.  Here, Petitioner admittedly did not present an ineffective-assistance claim regarding juror bias or misconduct in his Rule 37 petition.  He, therefore, cannot rely upon ineffective assistance of counsel to excuse the default of the juror misconduct claim.   Furthermore, because there is no constitutional entitlement to counsel in state post-conviction proceedings, he cannot blame his Rule 37 attorney (the same one who represents him now) for any default that occurred there.  *Coleman*, 501 U.S. at 752, 757; *Interiano*, 471 F.3d at 856-57.

Ground 3 is procedurally defaulted.

## VI.
## Actual Innocence

Petitioner asserts that he is actually innocent, that the victim's real killer is still on the streets, and that he has met the "miscarriage of justice" standard recently explained by the United States Supreme Court in *House v. Bell*, 126 S. Ct. 2064 (2006) (docket entries #3, at 13-17; #16, at 1-2).

In a noncapital case such as this, an assertion of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). *See House*, 126 S. Ct. at 2086-87; *Schlup v. Delo*, 513 U.S. 298, 313-17 (1995); *Mansfield v. Dormire*, 202 F.3d 1018, 1023-24 (8th Cir. 2000). Even assuming that such a free-standing claim could be raised, the standard "would necessarily be extraordinarily high," requiring a showing of new facts which "unquestionably establish" his innocence. *Herrera*, 506 U.S. at 417; *Schlup*, 513 U.S. at 862.

A different standard applies for a habeas petitioner to pass through the actual innocence "gateway" and gain federal habeas review of otherwise procedurally defaulted claims, as was the issue in *House*. To fit within this demanding exception, a habeas petitioner must (1) support his allegations of constitutional error with new reliable evidence not presented at trial and (2) show "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 126 S. Ct. at 2077; *Schlup,* 513 U.S. at 324, 329. "Without any new

evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup*, 513 U.S. at 316.  Moreover, the exception is concerned with claims of factual innocence, as compared to legal innocence.  *Calderon v. Thompson*, 523 U.S. 538, 559 (1998).

In support of his claim of actual innocence, Petitioner points to the following:

(1)     An affidavit from Butch Gray, dated September 24, 2001, which was submitted in his state habeas action (*see* docket entry #3, at 6 n.7).[15]  According to Petitioner, Gray stated that he was at party in the victim's trailer park the night of the murder and saw Dwight Jones' car outside the victim's trailer between 11:00 p.m. and midnight.  He says this places Jones and "potentially" Reginald "Bubba" Brim at the victim's house just before the murder.  Jones testified at trial that he worked all night.  (R. 2062-65.)  Brim confirmed this, but testified that he and Jones drove around and smoked crack with Petitioner the next morning when Jones got off work. (R. 1870-71, 1875.)

(2)     Petitioner's belief that the victim was an informant for local police, which he says he has learned since his Rule 37 post-conviction proceedings and would provide a motive for someone besides Petitioner to kill her.

(3)     The absence of his fingerprints from the murder weapon.

(4)     The possible presence of other individuals' fingerprints on the weapon.

(5)     The circumstances surrounding his confession, which he says was involuntary and inaccurate for the reasons set forth earlier.

For purposes of the actual-innocence exception, evidence is "new" only if it "was not available at trial and could not have been discovered earlier through the exercise of due diligence."  *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1569 (2006); *Nance v. Norris*, 392 F.3d 284, 291 (8th Cir. 2004) (no actual-innocence

---

[15]The affidavit was not attached to the copy of the state habeas petition submitted as Resp't Ex. 11; however, it can be found on page 11 of the appellate record in Petitioner's first state habeas appeal (Ark. Sup. Ct. Case No. 02-00145), which also was submitted.

showing with information that was available at trial, on direct appeal and throughout post-conviction proceedings).  Gray's affidavit is "new" in the sense that it did not exist at the time of Petitioner's trial, as is Petitioner's allegedly new information about the victim's status as an informant.  However, the underlying premise – that someone else might have had motive and opportunity to murder the victim – was known to Petitioner at the time of his trial, at the time of his direct appeal, and at the time for seeking post-trial and post-conviction relief.  Indeed, Petitioner's primary defense at trial was that there were "just too many things that [are] not there, that [don't] point to Johnny Rucker." (R. 2266.)  The later procurement of evidence supporting his defense theory does not make it "new" for purposes of invoking the actual-innocence exception.  *Osborne*, 411 F.3d at 919-20 (no "new" evidence where affidavit was based on information existing at time of trial, which could have been discovered earlier if pursued with diligence); *Bannister v. Delo*, 100 F.3d 610, 618 (8th Cir. 1996) (affidavit is not new evidence if defendant was aware at trial of facts contained in affidavit, even if defendant was not aware of document itself).

Moreover, Gray's affidavit and the victim's purported informant status do not "affirmatively demonstrate that [Petitioner] is innocent of the crime for which he was convicted," as required for this exception to be applicable.  *Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir.), *cert. denied*, 127 S. Ct. 590 (2006).  Where new evidence would simply set up a "swearing match" among witnesses, it does not establish that no reasonable juror would have credited the testimony of the state's witnesses and found the petitioner guilty beyond a reasonable doubt.  *Moore-El v. Luebbers*, 446 F.3d 890, 903 (8th Cir.), *cert. denied*, 127 S. Ct. 673 (2006); *see also Cox*, 398 F.3d at 1031 (no actual-innocence claim where recantation would serve only to potentially impeach credibility of other witnesses,

but could not prove petitioner did not shoot the victim); *Morris v. Dormire*, 217 F.3d 556, 559-60 (8th Cir. 2000) (evidence did not show actual innocence where only tended to impeach and was cumulative).

The inconclusive nature of the fingerprint evidence was also known to Petitioner at the time of trial and throughout his post-conviction proceedings, as were the factors supporting his false confession claim. As explained earlier, even a favorable result from retesting the prints would not affirmatively demonstrate his factual innocence. Additionally, his argument that his confession was involuntary presents a question of legal innocence, not actual innocence. *See Bannister*, 100 F.3d at 618 (evidence questioning weight of defendant's statement and officers' credibility presented claim of legal, not factual, innocence); *Nolan v. Armontrout*, 973 F.2d 615, 617 (8th Cir. 1992) (claim that conviction was based on involuntary confession is one of legal innocence).

Furthermore, Petitioner's actual-innocence argument cannot serve as a basis for the Court to grant his request for further fingerprint testing. "To avail himself of [the actual innocence gateway], it is the petitioner's, not the court's, burden to *support* his allegations of 'actual innocence' by *presenting* 'new reliable evidence' of his innocence." *Battle v. Delo*, 64 F.3d 347, 354 (8th Cir. 1995) (emphasis in original) (refusing to remand to district court for evidentiary hearing to enable petitioner to develop allegedly exonerating evidence). A federal habeas petitioner is not entitled to a hearing in federal court to *develop* evidence of his actual innocence. *Id.* at 353-55. The Eighth Circuit has rejected the "circular" argument to "excuse [an] evidentiary default as to [a] claim of actual innocence, through the actual innocence exception, in order that [a petitioner] may develop

sufficient evidence of his actual innocence." *Id.* at 354; *see Weeks v. Bowersox*, 119 F.3d 1342, 1353 (8th Cir. 1997); *Bannister*, 100 F.3d at 617.

*House* is distinguishable from Petitioner's situation. *House* was a capital case where the central forensic proof connecting the defendant to the crime had been undermined by new DNA testing, testimony from an expert forensic pathologist cast doubt on the reliability of other blood evidence, and the defendant had put forward substantial evidence pointing to a different suspect, including a confession by that suspect. *House*, 126 S. Ct. at 2078-86. In contrast, Petitioner's conviction hinged on his own confession, which this Court has found to be voluntary and which is not significantly undermined by the tenuous possibility of new fingerprint evidence, and Petitioner presents only vague suggestions of involvement on the part of other potential suspects.

Under these circumstances, Petitioner's claim of actual innocence does not entitle him to relief here, nor does it entitle him to review of any procedurally defaulted claims.

VII.
<u>Conclusion</u>

For the reasons set forth above, Petitioner's claims are without merit or are procedurally barred. Therefore, this 28 U.S.C. § 2254 petition for writ of habeas corpus (docket entry #3) is dismissed in its entirety, with prejudice.

IT IS SO ORDERED this 11th day of March, 2008.

UNITED STATES MAGISTRATE JUDGE